IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Frederick D. Shepherd, Jr., | ) | C/A No. 8:15-cv-04337-DCC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Community First Bank, Community | ) | |
| First Bank SERP Plan, Richard D. | ) | **OPINION AND ORDER** |
| Burleson, Gary V. Thrift, Dr. Larry S. | ) | |
| Bowman, William M. Brown, John R. | ) | |
| Hamrick, James E. Turner, Charles L. | ) | |
| Winchester, and Robert H. Edwards, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pending before this Court are the parties cross Memorandums in Support of

Judgment.  ECF Nos. 98, 99.  Plaintiff, Frederick D. Shepherd, Jr. ("Shepherd") asserts

entitlement to retirement benefits pursuant to the Employee Retirement Income Security

Act of 1974 ("ERISA").  Specifically, Shepherd asserts a claim for benefits pursuant to 29

U.S.C. § 1132(a)(1)(B), an administrative penalty under 29 U.S.C. § 1132(c), and a claim

for attorney's fees under 29 U.S.C. 1132(g).

The dispute centers on Shepherd's former employment as Bank President at

Defendant Community First Bank ("Bank").  In 2007, as Shepherd was approaching

retirement age, the Bank entered into an Employment Agreement and Deferred

Compensation SERP Plan ("Plan") to entice him to continue working at the Bank.  In order

to attain full benefits, the Plan required Shepherd to continue employment at the Bank

until 2012, when he reached 71 years of age.  After Shepherd completed working until

age 71, the Plan Administrator determined him eligible for benefits in 2012, and began

making benefit payments. However, in May 2015, new Bank management terminated his Plan benefits. The Plan Administrator stated it stopped benefits based on alleged misconduct the Bank discovered after Shepherd retired.

In resolving the denial of benefits, the parties entered into a Joint Stipulation agreeing that Administrative Remedies were exhausted but disagreeing as to the appropriate Standard of Review and the substance of the Administrative Record ("AR"). ECF No. 88. The parties, do however, stipulate that the Court may resolve this matter based on the Joint Stipulation, memoranda in support of their cases, and attachments thereto.

The principal issue before this Court, as in any ERISA case is: whether the Plan Administrator's decision should be upheld? After consideration of the parties' arguments and memoranda, the Court finds the Plan Administrator's decision should be reversed and grants the relief requested to Plaintiff Shepherd.

## FINDINGS OF FACT

The Court makes the following findings of fact in accord with the Administrative Record and the parties' stipulations:

### A. Plan Inception

Plaintiff, Frederick D. Shepherd, Jr., was hired in 1990 to become President and CEO of Community First Bank (Bank). In 2007, the Bank wished to secure Shepherd's future employment. To accomplish this, the Bank adopted a Resolution on March 2, 2007 to execute an Employment Agreement and Deferred Compensation SERP Plan ("Plan") with Shepherd. The Bank approved the SERP Plan without Shepherd's direct or indirect participation, or vote.

The Bank set the Plan up as a "top hat" by filing a "Top Hat Plan Exemption" with the Department of Labor ("DOL"). ECF 93-1. The legal effect of this filing exempted the Bank from ERISA's reporting, funding, and fiduciary requirements that are applicable to most ERISA plans. *Id.* The Bank funded the Plan through bank-owned life insurance, instead of funding it from the Bank's assets. Shepherd agreed to be paid as a general creditor out of the Bank assets. In addition, Shepherd substituted components of his annual compensation in exchange for the deferred compensation.

## B. The Plan Terms

The Court finds the Plan terms are clear and unambiguous. The Bank and Shepherd, as Bank President, had equal bargaining power and negotiated at arm's length the terms acceptable to each.

The "Whereas" clauses state the purpose of the Plan was to "encourage the Executive [Shepherd] to remain an employee of the Bank…" The "Whereas" clauses also show the parties contemplated the "Golden Parachute" regulations in the banking industry, and found them to be inapplicable.

The accrual terms state that for each year Shepherd completed, the Plan would defer a set amount of earned compensation. If Shepherd completed employment until retirement age, defined by Section 1.10 as age 71, then Section 2.1 of the Plan provided Shepherd with the full benefit amount, $210,000 per year for 20 years.

The Plan also included four clear clauses that authorized termination of benefit payments, each found in Article 5. The Plan stated benefits could be stopped for: (1) a termination "for cause;" (2) FDIC removal of Shepherd as Bank President; (3) FDIC placing the Bank into Default; or (4) FDIC providing "open-bank assistance." The parties

agree and the Court concurs that none of the four reasons for termination of benefits have occurred. Section 7.1 further provides that any terminations, "except those occurring under Article 5," can only be accomplished by a written agreement between the Bank and the Executive. The parties agree and the Court concurs there have been no changes to the Plan.

Section 2.8 governs the timing of the eligibility determination. This section states eligibility must be determined "by the first event to occur that is dealt with by this agreement." Once the "first event" occurs, the Plan sets benefits. Again, the parties do not dispute, and the Court concurs, that the first event to occur was Shepherd's completion of employment until age 71.

Section 8.1 of the Plan directs that the Bank's Board of Director's shall also serve as the Plan Administrator. The Plan grants the Administrator general discretion to make, amend, interpret, and enforce rules and regulations for the administration of the agreement, as well as decide or resolve questions and interpretations of the Plan.

Reading the Plan as a whole, the Court finds this general grant of discretion is specifically limited by Sections 7.1 and 2.8. Plan Section 7.1 constrains the Administrator from using its discretion to amend or terminate the Plan for reasons outside of the Plan without a written agreement. Likewise, Section 2.8 places a deadline on the Administrators discretion to determine the eligibility at the "first event to occur."

The final pertinent Plan provision is found at Section 1.14. This section defines "termination for cause" as having "the same meaning specified in any effective severance or employment agreement existing on the date hereof or hereafter entered into . . . ." Since Shepherd entered into an Employment Agreement that defined "termination for

cause," Section 1.14 is inapplicable and the Court must look to this Agreement to address "for cause" issues.

Under the Employment Agreement, a "termination for cause" required a procedure akin to "due process" in which the Bank was required: (1) to hold a meeting of the Board of Directors; (2) at that meeting adopt a Resolution, via majority vote; containing findings of actions constituting cause; (4) deliver said resolution to Shepherd; and (5) notice another meeting to terminate Shepherd for cause where he is provided an opportunity to be heard.

Importantly, under either Section 1.14 of the Plan or Section 3.2 of the Employment Agreement, the ability to terminate Shepherd "for cause" is reserved exclusively to the Bank. Neither section reserves the right to the Plan Administrator to determine if "cause" exists.

## C. Shepherd's Benefits and Retirement

Shepherd completed employment at age 71 on December 31, 2011. (AR 797-98). At that time, the Plan Administrator determined him eligible for benefits and commenced payments in 2012. Also in 2012, the FDIC conducted an audit of the Bank which included criticisms of multiple loans, including loans to John Powell and James McCoy. Each Bank Board Member signed the Report acknowledging it had been received and read.

On July 31, 2014 Shepherd attended a Bank Board meeting and gave notice of his intent to retire due to health concerns During the meeting, the Board questioned Shepherd extensively about issues surrounding loans made to John Powell and James McCoy. *Id.* at 1687-88. The Bank did not take action to terminate Shepherd "for cause" at this time.

Before retiring six months later, Shepherd attended another Bank Board meeting. During this meeting, on December 31 2014, Shepherd told the Board he expected his benefits to be paid. The Board discussed future payments, as well as FDIC issues it discussed previously with its lawyer. Shepherd then retired as employee of the Bank on December 31, 2014.

Thereafter, the Plan Administrator continued to pay benefits into Shepherd's retirement. The Bank admits that Shepherd was not "terminated for cause." It also concedes that it never conducted the Employment Agreement process required to terminate Shepherd "for cause."

### D. The Decision to Terminate Benefits

In April 2015 at a Bank Board meeting, months after he retired, the new Bank President Richard Burleson initiated a discussion concerning stopping Shepherd's benefits for alleged misconduct. He acknowledged that there may be no merit to the allegations of Shepherd's misconduct, but pointed out that there was 2.5 million dollars of Bank shareholders' money sitting in a retirement fund for Shepherd. Other Board members noted the need to protect its shareholders. The Board discussed that if it stopped benefits, an investigation into the wrongdoing might retroactively justify the decision so the Board wouldn't have to prove anything.

At the next meeting in May of 2015, the Bank Board unanimously voted to terminate benefit payments. The Bank minutes show the Board neither looked at the Plan to determine if its actions were authorized nor met in its capacity as Plan Administrator. The Board chose to keep this decision a secret until after the May Shareholder's meeting.

On May 26, 2015, a law firm representing the Bank—not the Plan Administrator—wrote Shepherd notifying him he would no longer receive benefits. The letter mirrored the discussion of the Bank Board, stating discontinued payments was in the best interest of the Bank and its shareholders.

The Bank's notice never referenced the Plan, the Plan Administrator, Plan remedies, or ERISA. The correspondence further failed to give specific reasons for the denial; merely claiming the Bank would *reduce* benefits due to "golden parachute" regulations, and, conversely, would *stop* benefits entirely while the Bank investigated possible loan misconduct involving Shepherd. Finally, the letter failed to advise Shepherd of his ERISA rights.

### E. The ERISA Administrative Process

On June 19, 2015, Shepherd made a timely claim for benefits with the Plan Administrator. The Bank, not the Plan Administrator, responded acknowledging Shepherd's claim on June 23, 2015. (AR 805)

On August 6, 2015, since Shepherd was dealing with the Bank and not the Plan Administrator, he submitted a document request to the Bank as a shareholder. However, he requested documents related to the Plan, the decision to limit or suspend payments, and investigations into matters upon which the suspension or denial of benefits was based. The Bank's litigation firm promptly responded denying the request for documents, and shortly thereafter, filed a state court lawsuit for the Bank against Shepherd. The Bank's lawsuit asserted claims for alleged loan misconduct by Shepherd, Powell, and McCoy, allegations previously discussed in the FDIC Report in 2012 and the Board meeting in July of 2014.

On September 17, 2018, the 90-day time allotted under Plan Section 6.1.2 for the Plan Administrator to respond to Shepherd's claim expired without any response. Having received no response, Shepherd filed a lawsuit for benefits in state court. That lawsuit, the instant action, was removed to this Court pursuant to ERISA.

After Shepherd amended his Complaint, the Defendants filed a Motion to Dismiss or Stay The Case that asserted Shepherd failed to exhaust administrative remedies. Shepherd argued that the failure to exhaust remedies was solely due to the Plan Administrator's noncompliance and that 29 C.F.R. § 2650.503 deemed administrative remedies exhausted in these situations.

**F. The Plan Administrator's Arrival**

During the pendency of the Motion to enforce plan remedies, the Plan Administrator submitted its first correspondence to Shepherd. On May 16, 2016, when Shepherd had been without benefits for almost a year due to the Bank's denial notice, the Plan Administrator sent a second denial notice. This denial letter differed substantially from the Bank's initial denial. First, the Administrator claimed "golden parachute" regulations required benefits to be terminated instead of reduced. Next, the notice failed to mention investigations, and now included conclusory allegations of misconduct relating to Bank loans. The letter instructed Shepherd he had 60 days to respond.

During the 60-day period, this Court held the Administrator violated ERISA regulations by not timely responding, but noted the Fourth Circuit remedy for the violation was a remand to the Administrator to complete the plan remedy process. The Court ordered a 60-day stay in accord with Section 6.2.1 of the Plan to allow the parties to complete the "claims review procedures of the Plan."

Upon remand, however, the Plan Administrator returned to the 90-day "claims procedure" found in 6.1.3 and sent a third denial letter on March 7, 2017. This denial letter differed from: (1) the Bank's initial denial of benefits in May of 2015; and (2) the Administrator's denial of benefits in May 2016. It asserted new conclusory allegations of misconduct.

### G. Shepherd's Appeal

Due to the three differing denials, Shepherd submitted correspondence to the Plan Administrator that requested relevant documents to aid him in his appeal. Shepherd requested documents known to the Administrator that formed the basis for each denial and documents that illustrated compliance with ERISA.

In response, the same litigation firm representing the Bank wrote on behalf of the Plan Administrator[1] and refused to produce documents or specify which documents were known at each denial. The law firm claimed Shepherd was in possession of the Administrator's documents, which were produced to him in the Bank's state court case.

Notwithstanding this refusal, Shepherd noticed his appeal on April 7, 2017. Shepherd argued: (1) benefits were set once he worked until he was 71 years of age without having been terminated for cause; (2) the Bank admitted none of the four reasons in the Plan for terminating benefits had ever occurred; (3) that reliance by the Bank or Administrator on section 1.14 was not applicable due to the Employment Agreement and the termination "for cause" process contained therein; (4) the Bank failed to consider three legal opinions and FDIC emails showing the "golden parachute" applications were

---

[1] The Brooks Pierce Law firm: (1) sent the initial denial letter for the Bank; (2) represented the Bank in its state court lawsuit; and (3) wrote on behalf of the Plan Administrator.

inapplicable; and (5) all allegations of misconduct claimed to be newly discovered had been discussed before he retired and therefore did not qualify as after-acquired evidence.

On May 2, 2017, the Plan Administrator submitted its final denial of benefits on appeal. It claimed it used its discretion to interpret the Plan to deny benefits based on misconduct it found after Shepherd retired that would have caused the Bank to previously terminate him "for cause." In addition, the Administrator claimed authority to deny benefits based on factors outside of the Plan terms, citing common law doctrines and FDIC Regulations. In issuing the denial, the Administrator failed to address many of Shepherd's arguments and documents he submitted. The Administrator also claimed it relied on 41,000 pages of information in the Bank's state court lawsuit.

## H. The Bank's State Court Lawsuit

A discussion of the Bank's state court case is necessary to understand the Administrator's claims regarding the evidence it relied upon and the Administrative Record. The Bank's state court lawsuit allegations against Shepherd, Powell, and McCoy subsequently transformed into the Plan Administrators *factual determinations* claimed to justify the denial of benefits. In the Bank's initial denial letter to Shepherd, it justified the denial of benefits while it "investigated" wrongdoing. The Bank used its state court lawsuit as its "investigation" to search for reasons to justify its previous decision to terminate benefits. This ongoing "investigation" led to the multiple, changing denial notices.

While pursuing plan remedies in this ERISA case, however, Shepherd explained to the Plan Administrator that if the documents in the state case are possibly related, then Shepherd was submitting documents related to the Bank's discovery misconduct because the document production in that case was incomplete. He further emphasized to the

Administrator that the judge in the state court believed the Bank played discovery games, took liberties with the Rules, possibly used the criminal system to gain an unfair advantage in its civil case, and as a result made the Bank President sign an affidavit concerning the completeness of the Bank's document production under the penalty of perjury.

The Administrative Record shows during the course of the state case, the Bank, Shepherd, Powell, and McCoy were engaged in a discovery dispute over the Bank's failure to produce documents. In April of 2016, the Bank had only produced 8,602 documents. After a hearing on Shepherd's Motion to Compel further documents, the Court ordered the Bank to produce the documents Shepherd requested. Over the course of this ongoing discovery dispute, and pursuant to the court Order, the Bank produced an additional 32,000 pages over the next 8 months. However, Shepherd contended discovery was still incomplete and alleged the Bank failed to comply with the Order. Therefore, Shepherd filed a Motion to Sanction the Bank.

Ultimately, the state court issued scathing sanctions Orders against the Bank for discovery abuse and intentionally withholding documents, as well as ordered it to pay $64,920.04 in fees and costs to Shepherd's attorneys. ECF 99-5. After Shepherd finally compelled the production of 49,168 documents on October 30, 2017, the Bank decided to dismiss its lawsuit against Shepherd.

Initially, Shepherd refused to agree to a dismissal; so the Bank filed a Motion arguing that Shepherd would not be prejudiced by a dismissal since the Bank sought no recovery from him. As a result, Shepherd finally agreed to let the Bank dismiss its state court case. This dismissed case contained allegations identical to many of the misconduct

allegations asserted by the Plan Administrator.

## I. Administrative Record

While the parties have stipulated that the administrative remedy process has been completed, Shepherd argues the Administrative Record is "in doubt." Principally, he asserts the Administrative Record should contain the information known to an administrator at the time each decision was made, information previously requested but never produced.

In the Fourth Circuit, the administrative record consists of "the facts known to [the administrator] at the time" it rendered its decision. *Sheppard v. Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994). ERISA defines relevant documents as those which were generated, considered, and, ultimately, relied upon to make the benefit determination. 29 C.F.R. § 2560.503-1(i)(5). It also defines relevant documents as those evidencing compliance with ERISA's procedural and substantive regulations. *Id.*

### 1. The Administrative Record Submitted

At the outset, the Court notes that the Administrator has continually shifted its view of the composition of the Administrative Record. First, during the court ordered administrative remedy process, the law firm dually representing the Bank and Administrator claimed the documents that formed the basis for the Plan Administrator's determination to deny Mr. Shepherd's claim, were *produced by the Bank* in the state court lawsuit by April 2016. The law firm further contended "Mr. Shepherd has had the documents relied on by the Plan Administrator for nearly a year." As of April 2016, the Bank had produced 8,062 documents. ECF 99-5. The law firm, on behalf of the

Administrator, did not provide any documents as a Record, and further, refused to explain what documents were considered at each of the multiple denial decisions.

However, at the end of the Appeal Process, the Administrator changed its position on the documents comprising the Record. The final denial stated "the Bank has provided in excess of 41,000 pages of information." Similarly, the Defendants assert "the Plan Administrator . . . provided over 41,000 pages of documents . . . in specific support of the Plan Administrator's decision." ECF 98 at 30.

The Court notes that the paginated Administrative Record submitted only consists of 1,691 pages. Therefore, the Court has approximately 2% of the relied-upon documents in the Record. Additionally, the Defendants have submitted a listing *of when* documents were produced to Shepherd. ECF 104-1. Also taking the Administrator at its word, the document evidences multiple document productions after the April 2016 date originally asserted. These dates also illustrate most of the state court document production was *compelled by Shepherd*, and the Bank continued document production as late as October 2017, after it was sanctioned for discovery abuse and the ERISA Record in this case had closed.

Finally, the Administrator's refusal to categorize the documents to each denial makes it impossible to discern what documents were either known to, or relied upon, by the Administrator at the time of each benefit denial decision, or what documents were newly generated in the subsequent denials.

### 2. Documents Outside of the Administrative Record

As a related matter, both parties have submitted documents for this Court's consideration that are outside of the paginated Administrative Record. The Defendants

submitted document ECF 104-1.  This document purports to be a record of document productions, descriptions, and dates on which they were produced.  These document descriptions and factual dates are found nowhere in the Administrative Record.

Shepherd submitted attachments with his memorandum, ECF 99-5.  These attachments are as follows: (1) pages 1–5 show the amount of documents produced in the state case; (2) pages 6–39 are the state court discovery sanctions orders; (3) pages 40–48 are the state court dismissal documents; and (5) pages 49–51 are correspondence between the parties concerning the production of the Administrative Record 48 hours before briefing was due.

As the Court will more fully explain later herein, these additional documents are not necessary to a determination of benefits, as that issue revolves around the Court's interpretation of the Plan language and its purpose, but do assist in providing a complete picture of the issues involving the conflict of interest, inadequacy of the Administrative Record, and the reliance on the Bank's state court documents.

At the start, the Court notes that both parties have stipulated that the Court may decide the case based on the memoranda.  ECF 88-1. The Fourth Circuit has articulated when evidence outside of the Administrative Record is appropriate.  When a court reviews an administrator's decision *de novo*, it should only review the evidentiary record presented to the administrator unless the court finds additional evidence is "necessary for resolution of the benefit claim." *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1026-27 (4th Cir. 1993)

In contrast, when the standard is an abuse of discretion, the Fourth Circuit has directed courts to consider evidence outside of the record only if it is necessary to

adequately analyze the *Booth*[2] factors and was known to the Administrator at the time it rendered its benefit decision.  *Helton v. AT&T*, 709 F.3d 343, 356 (4th Cir. 2013)  That is so because "[a]n ERISA plan administrator can be charged with knowledge of information acquired by its [plan sponsor's] employees in the scope of their employment and the contents of its books and records."  *Id.*

Under this guidance, the extrinsic evidence submitted by both parties should be considered as part of the Administrative Record.  First, the documents are necessary for the Court to analyze the *Booth* factors, specifically the weight of the conflict of interest on the Administrator's decision, and to a lesser degree whether the decision is supported by substantial evidence.  The documents aid in weighing the impact of the conflict of interest because they relate to the composition of the Administrative Record and the disclosure of documents by the Bank Board.  The extrinsic evidence proffered by the Defendants, ECF 104-1, shows document production in the state court case continued after April of 2016.  Shepherd's proffered evidence shows the state court production finished in October of 2017, after the May 2017 Decision on Appeal.  Since the Administrator submitted almost entirely Bank documents in support of its denial, to fail to consider this evidence would allow the Bank, operating in its dual capacity, to withhold documents in the state case and end ERISA plan remedies before Shepherd obtained requested documents.

Next, Shepherd's documents aid in ascertaining the effect the conflict of interest had on the credibility of the Administrative Record, as the Bank was sanctioned during this process and dismissed its case shortly after the last document production.  This also

---

[2] *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342-43 (4th Cir. 2000)

makes the evidence relevant to determining whether the decision is supported by substantial evidence and sheds light on Shepherd's complaints during the administrative process.

Finally, the Court finds these were documents known to the Plan Administrator through the Bank Board members' role as Plan Administrator. The Sanctions Orders clearly illustrate that the Bank was purposefully withholding documents in its possession and Shepherd explained this to the Administrator during the plan remedy process. Once the documents were disclosed, the Bank was certainly aware that its lawsuit was in jeopardy due to documents directly contradicting some of its allegations.

Consequently, the Court finds these documents were not available to Shepherd at the time of the Administrator's decision because the Bank's "investigative" lawsuit continued on after the close of the ERISA Plan remedy process. The substance of the pleadings and documents proffered by the parties were known to the Administrator and aid in analyzing the *Booth* factors.

The Court finds all documents proper, except documents 98-5 pages 49-51. Those documents are emails between the parties concerning the disclosure of the paginated Administrative Record and were neither known to the Administrator at the time of the decision nor are relevant to the *Booth* factors and will not be considered.

## SCOPE OF REVIEW

To remedy the issues the Administrator has caused with multiple denials and the Administrative Record, this Court will limit its review of the Plan Administrator's decision to the last Notice of Denial on Appeal and its support by the paginated Administrative Record. The specific issues surrounding previous denials, and documents supporting

them, can be properly assessed by the *Booth* Factors.

As a threshold matter, before getting to the *Booth* factors, this Court must decide the standard of review applicable to the Administrator's decision to terminate benefits. In this case, the type of ERISA Plan guides the Court in its analysis of the proper standard on review.

### A. The Type of ERISA Plan

The parties do not dispute that the ERISA plan at issue is a "top hat" plan.[3] This Court finds the Plan is a "top hat" plan for ERISA purposes. ERISA defines a "top hat plan" as an unfunded plan that is "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2).

This Plan is an unfunded arrangement (§ 7.8) maintained by the Bank to defer compensation for its former Bank President, the only employee who received such a plan. If there were any doubt as to whether this is a "top hat" plan, it is erased by the Bank's filing of a "top hat" exemption with the Department of Labor.

### B. The "Top Hat" Standard on Review

For most ERISA plans, a court's review of an Administrator's decision starts as *de novo* "consistent with the judicial interpretation of employee benefit plans prior to the enactment of ERISA" when an employer's denial of benefits was "governed by principles of contract law." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989). If,

---

[3] The Administrator originally asserted to this Court that the Plan was not a "top hat." ECF 91. This position occurred during the period it failed to produce the "Top Hat Exemption" filed with the DOL. After Shepherd received this filing from the DOL, he submitted it to the Court. ECF 93 and 93-1.

however, the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, decisions should be reviewed under the deferential "abuse of discretion" standard. *Williams v Metro Life Ins. Co.*, 609 F.3d 622, 629–30 (4th Cir. 2010). This deferential standard is appropriate because ERISA is predicated on trust principles, so the administrator, as a fiduciary, is expected to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries…" 29 U.S.C. § 1104(a)(1).

Nevertheless, Circuits have split as to appropriate standard of review regarding "top hat" plans. *Plotnick v. Computer Sciences Corp. Deferred Compensation Plan for Key Executives*, 875 F.3d 160, 164–65 (4th Cir. 2017) "Since top-hat plans involve non-fiduciary administrators," some Circuits have found the ERISA analogy to trust law fails, and court should treat "top hat" plans as unilateral contracts with *de novo* standards of review. *Id.* at 165. Conversely, other Circuits have determined that courts must give effect to terms conferring discretion, and analyze decisions based on the same *Firestone* abuse of discretion standard as other ERISA plans. *Id.*

In the only Fourth Circuit case addressing the appropriate standard on review for a "top hat" plan, it failed to adopt a specific standard. *Id.* at 164-65. Instead of articulating a standard, the Fourth Circuit approved the district court's use of the analysis by the First and Second Circuits. *Id.* at 165. These Circuits noted that the standard on review was essentially the same under either a "unilateral contract" approach or the *Firestone* abuse of discretion standard. *Id.* at 166.

Under the "contract" approach, the district court noted that it would "evaluate the administrators' determination by analyzing whether the exercise of discretion was done

in good faith, the touchstone of which is reasonableness."  *Id.* (internal quotations and citations omitted).  Similarly, in practical application of the *Firestone* abuse of discretion standard, an administrator's decision should stand if it is "reasonable."  *Id.*  As such, the standard made no practical difference, and the Fourth Circuit approved the court's review under a "reasonableness" standard.

## C. The Appropriate Standard

Nevertheless, Shepherd argues a *de novo* standard is warranted because the Administrator's decision to terminate benefits, which were earned through acceptance in a unilateral contract, amounts to a legal determination. This argument encompasses his added assertion that the Administrator had no discretion under Section 2.8 after Shepherd's employment until age 71 was the "first event" event to occur.

Nevertheless, this Court finds that a *de novo* standard is not appropriate.  The "reasonableness" standard approved by the Fourth Circuit in *Plotnick* for "top hat" plans takes into the account that this Plan is a unilateral contract and strikes a balance of appropriate deference to the Plan.  As such, under the guidance of *Plotnick*, this Court finds the applicable standard of review can be reduced to: was the Administrator's decision to terminate Shepherd's benefits after he had worked to age 71 based on a "reasonable" interpretation of the Plan?

Fortunately, the standard of review is not outcome determinative, as this Court would not uphold the Administrator's decision to terminate Shepherd's benefits under either the de *novo*, abuse of discretion, or "reasonableness" standards.  An analysis under the the Fourth Circuit's reasonableness framework illustrates that the same conclusion would result under any standard.

## PLAINTIFF'S CLAIM FOR BENEFITS

Principally, Shepherd asserts he is entitled to benefits because the Plan vested his right to benefits after he accepted the Bank's offer by working until age 71; the post-acceptance termination is not authorized by the Plan language; and the allegations of misconduct are irrelevant, unproven, and tainted by the Administrator's conflict of interest.

Conversely, the Defendants assert Plan Section 8.1 grants broad discretion to the Administrator to interpret and enforce the Plan. Using that discretion, the Administrator interpreted the language of the Plan to authorize an eligibility decision after Shepherd completed his work obligation and even into his retirement. The Administrator made an eligibility determination after the completed employment and concluded that Shepherd committed misconduct, under Section 1.14, starting in the 1990's related to Shepherd's handling and misconduct in loans to Powell and McCoy. The Administrator further concluded the Bank was not aware of this misconduct until 2015, and it would have terminated Shepherd "for cause" if it had known.

Initially, the Court must clarify its role in this ERISA matter. The Court is required to determine the reasonableness of the Administrator's decision to terminate benefits. Based on the Plan, the Court concludes analyzing the merit and reasonableness of the misconduct determinations by the Administrator is outside the scope of this Court's role because it is specifically prevented by the Plan.

Generally, the Plan contains a simple procedure for paying benefits or denying benefits. The Plan vests rights to benefits, or authorizes a termination, at the "first event to occur." The relevant "first events" to occur in this dispute were either Shepherd completing employment until age 71 or a termination "for cause." Section 8.5 required

the Bank to supply the Administrator with information concerning the circumstances of the separation for service. With that information, the Administrator determines whether it should pay or deny benefits.

More importantly, the Plan specifically excludes the Plan Administrator from unilaterally weighing evidence to determine a "for cause" termination. Section 1.14 prohibits the Administrator from determining a "for cause" termination under either the Plan or an Employment Agreement. Section 1.14 states *the Bank* must determine "for cause" if no Employment Agreement, and if an Employment Agreement exists, "for cause" is therein. The Employment Agreement between the parties reserves the right to the Bank to terminate Shepherd "for cause," but only after it has initiated a process to give him a chance to be heard.

Therefore, as a threshold matter, the Court concludes the Plan Administrator's weighing evidence of misconduct improper under the terms of this ERISA plan. The Plan only permits the Administrator to deny benefits after the Bank has finalized a "for cause" termination under the Employment Agreement. It is undisputed this was never done. Since the Administrator is prohibited from weighing the evidence of misconduct; likewise, this Court cannot engage in determining the merits.

Therefore, the Court will limit its analysis exclusively to the reasonableness of the decision to terminate benefits under the *Booth* factors. The similarities between a "reasonableness" review and the *Firestone* abuse of discretion standard allows the Court to analyze the Administrator's decision to terminate benefits under the Fourth Circuit's deferential abuse of discretion framework.

In *Booth*, the Fourth Circuit instructed that a court reviewing the reasonableness

of an administrator's discretionary decision under ERISA should weigh eight non-exclusive factors: (1) the language of the plan; (2) the purposes and goals of the Plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with other interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342–43 (4th Cir. 2000).

## A. The Plan and its Administration

The first factors the Court reviews relate to the Plan's terms, its purpose, previous interpretations, and standards relevant to "top hat" plans. These factors are important to understand the Plan, itself, and how it has been previously interpreted.

### 1. The Plain Language of the Plan

The plain language of the Plan requires the Administrator to pay benefits. The Plan was designed to pay benefits upon the completion of Shepherds additional employment.

In a "top hat" plan, the plain language takes on an added importance not found in other types of ERISA plans. *See Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir. 2001). "These plans are intended to compensate only highly-paid executives, and the Department of Labor has expressed the view that such employees are in a strong bargaining position relative to their employers and thus do not require the same

substantive protections that are necessary for other employees." *Id.* "Accordingly, top hat plans are not subject to any of ERISA's substantive provisions, including . . . vesting and funding" and "fiduciary requirements." *Id.* The Fourth Circuit has stated, in order to ensure the integrity of written, bargained-for benefit plans, a primary function of ERISA, the plain language of an ERISA plan must be enforced with "its literal and natural meaning." *United McGill Corp. v. Stinnett*, 154 F.3d 168, 172 (4th Cir. 1998) (internal citation and quotation omitted).

"[E]ven as an ERISA plan confers discretion on its administrator to interpret the plan, the administrator is not free to alter the terms of the plan or to construe unambiguous terms other than written." *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005), *abrogated on other grounds by Champion v. Black & Decker (U.S.), Inc.*, 550 F.3d 353 (4th Cir. 2008). To the extent the administrator is granted interpretive discretion, it only allows the administrator to resolve ambiguous terms. *Id.* "[S]uch discretion does not confer discretion to alter the plan's terms or to read out unambiguous provisions." *Id.* (citing *Firestone*, 489 U.S. at 112).

This "top hat" plan avoided many of ERISA's regulations. The parties had equal bargaining power and the freedom to draft benefit plans according to their needs and wants. The Bank and Shepherd were free to include, or exclude, plan terms as each saw fit, without worries of the substantive regulations of ERISA. The Court finds it must give the utmost deference to the terms of the Plan under these circumstances.

The Plan gave the Administrator discretion to determine the "first event." Section 8.5 required the Bank to provide the Administrator with documents evidencing the "first event." The clear language of Article 5 contains only four scenarios that could become a

disqualifying "first event." In determining the "first event," the Administrator is specifically limited by Sections 2.8 and 7.1. Section 2.8 requires the Administrator to determine eligibility *at the time* of the "first event to occur" while Section 7.1 prevents the Administrator from terminating benefits for reasons outside the Plan without a written agreement.

The Administrator improperly reads ambiguity into the plain terms of the Plan to justify the denial. The terms do not give the Administrator discretion to interpret the Plan as authorizing an eligibility decision *after* the "first event" occurs. The parties agree that Shepherd completed work until age 71 first. Further, the plain language neither provided discretion to deny benefits if an Article 5 scenario had not yet occurred nor for reasons outside of Article 5 such as common law and FDIC regulations.

Importantly, the plain language of the Plan specifically denies the Administrator authority to determine "for cause" under section 1.14. The parties reserved that right to the Bank, alone, by defining "cause" in Section 1.14 by resort to the Employment Agreement. Under the Employment Agreement, only the Bank could deem Shepherd terminated "for cause" after a process that included, at minimum, notice to him and an opportunity to be heard.

These protections allowed both parties to effectuate the intent of the agreement-paying Shepherd for a promised five more years as CEO while not requiring the Bank to keep Shepherd employed during those years or pay benefits, so long as it found he committed misconduct under a fair process where Shepherd had, essentially, "due process" rights. Section 1.14 protected Shepherd from the Administrator's unilateral determination of "cause" that occurred in this case.

The Plan Administrator's use of its discretion to interpret the Plan constitutes a re-writing of the Plan. It effectively rewrote the Plan to allow the Administrator to determine eligibility regardless of the timing of the "first event," to terminate benefits for reasons outside of Article 5, and to determine "for cause" unilaterally under section 1.14. It then interpreted the Plan as allowing for a denial pursuant to an Article 5 termination "for cause" that never occurred.

Each of the interpretations is expressly forbidden under the plain terms of the Plan. The terms were placed in the Plan by both parties to prohibit the exact conduct which occurred in this case—a completed promise by the CEO, and a Bank's pulling of benefits after retirement through unbridled discretion. Therefore, the Plan Administrator exceeded its grant of discretion to improperly read ambiguity into the Plan so it could interpret terms that were clearly unambiguous. The Administrator effectively re-wrote the Plan by ignoring the plain language and severely misconstruing the terms to form the basis of its denial.

## 2. The Plan's Purpose

The plain terms of the Plan are exactly what would be expected in a unilateral contract like this "top hat" Plan. The plain language of the Plan effectuated the purpose of the Bank's Plan. The Bank wanted Shepherd to delay his retirement, so it used the retirement benefits to entice him to remain employed at the Bank until age 71. Shepherd wanted to make sure when he successful completed the additional years of employment, benefits could not be later terminated.

The "Whereas" clauses of the Plan clearly state this purpose: to "encourage the Executive [Shepherd] to remain an employee of the Bank" because he "has substantially

contributed to the success of the Bank … the Bank is willing to provide salary continuation benefits . . . ."  The Defendants concede they wanted Shepherd to continue as Bank President, but assert the caveat that they required him to abstain from misconduct.

Presently, it is undisputed that the Shepherd retired from the Bank after he sacrificed his retirement years and worked from 2007 until 2014.  The Bank also admits that it neither terminated him "for cause" nor instituted the required process to determine "cause."  To the contrary the Bank never afforded Shepherd his bargained-for protections to determine "cause," instead choosing to keep its unilateral denial decision a secret even from the shareholders.

The Administrator chose to circumvent the Plan's purpose by determining eligibility after Shepherd had already completed and accepted his requirements under the Bank's contract.  The Plan's purpose, given effect through its plain terms, was meant to vest Shepherd's rights to payments at age 71, and specifically prevent the Administrator from perpetual authority to deny benefits.

Under these circumstances, the Plan purpose has been achieved for both parties. The Bank retained its employee, and Shepherd expected to be paid because he completed the contract through performance.  To determine this factor weighs in favor of the Administrator would create a windfall for the Bank.  The Court finds this factor weighs in favor or reversing the Administrator's decision.

### 3.  Interpretation Consistent with Other Interpretations

This current decision to deny Shepherd's benefits is undisputedly the second time the Administrator has determined eligibility and, arguably, its third.  The first eligibility determination occurred when Shepherd reached the age of 71 while still employed at the

Bank. Consistent with the plain language in the Plan found at Section 2.8, the Administrator determined Shepherd eligible at this time and began paying benefits. There is no dispute that the Administrator made payments under the Plan for a period of 3 years, 2012–2015.

The second eligibility determination arguably could have occurred in December of 2014 when Shepherd retired. Until that time, the Bank could have used the Employment Agreement to start the "for cause" termination process; specifically, when the Board discussed loan misconduct with Shepherd in July 2014. Instead, Shepherd specifically told the Bank Board that he expected to be paid his benefits after he retired during the December 2014 Board meeting. The Board discussed the payments, and the Bank accepted his retirement. Under any scenario, the separation from service was indisputably a retirement and rendered the Bank's/Administrator's subsequent determination inconsistent.

The current decision to terminate benefits is inconsistent with the previous determinations. At the time period in which the Administrator denied benefits, there had been no change in the status of the "first event to occur." Even assuming the Administrator retained discretion after the "first event" to deny benefits based on a termination "for cause," this justification was eliminated when the Shepherd retired from the Bank. As such this factor weighs in favor of reversing the Administrator's decision.

### 4. External Standards Relevant to Use of Discretion

Shepherd argues that "top hat" plans are unilateral contracts that are accepted upon performance of the contract terms, and, upon that performance, vest the employee with *a right* to benefits. The Defendants argue that "top hat" plans do not created a vested

right in payment that would prevent an Administrator from denying additional payments.

Without guidance from the Fourth Circuit on this issue, the Court finds the Third Circuit's often-cited "top hat" case as persuasive. In *In re New Valley Corp.*, the Third Circuit explains that a "top hat" plan is "a unilateral contract which create[s] vested rights in those employees who accep[t] the offer [the plan] contain[s] by continuing in the company's employment until retirement." 89 F.3d 143, 150 (3d Cir. 1995). "Under unilateral contract principles, once the employee performs, the offer becomes irrevocable, the contract is completed, and the employer is required to comply with its side of the bargain." *Id.* at 150–51. The Third Circuit further noted "in response to [a plan sponsor's] argument that the contract did not restrict its right to terminate the plan," that "even when a plan reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes that door under unilateral contract principles." *Id.* at 151 (quotation omitted). "Any other interpretation . . . would make the Plan's several specific and mandatory provisions ineffective, rendering the promises embodied therein completely illusory." *Id.* (quotation omitted) (alteration in original).

The Court finds this Plan is the quintessential version of a unilateral contract, and the standards and principles governing "top hat" plans weigh toward the unreasonableness of the denial. It is inconceivable that Shepherd would agree to delay his retirement, continue his employment until the age of 71, and agree to grant the Bank/Administrator an everlasting discretionary right to terminate his benefits. Instead, the Plan terms were set up to vest rights to benefits at the "first event to occur" under the contract, either successful completion of employment until age 71 or any applicable Article 5 limitations.

In sum, Shepherd clearly completed the prerequisites for benefits, and the Bank, having gained the benefit of the bargain, is now expected to live up to its promise. Although Shepherd has *no vested right to funds* superior to bank creditors because this is an unfunded agreement, "top hat" principles clarify that he had a vested *right to receive benefits* paid out of the general assets of the Bank, contrary to any other interpretation of the Plan.

### B.  Are the Allegations of Misconduct Reasonable and Supported?

The Court finds this "top hat" Plan had clear language vesting Shepherd's right to benefits at the time he completed the required employment until age 71.  Further, the Administrator's decision to terminate benefits resulted from both an impermissible interpretation of the Plan and an improper use of its discretion.  As a result, the Court need not address the allegations of misconduct or proceed further in its analysis.  The Administrator's denial should be reversed.

Nevertheless, assuming the Plan did authorize the Administrator to deny benefits after Shepherd completed working until age 71, the Court will subsequently analyze the Administrator's determination that benefits should be terminated based on claims that Shepherd participated in misconduct not known to the Bank until 2015.  This analysis can be accomplished through the remaining related *Booth* factors:

### 1.  Conflict of Interest

The Supreme Court has held that an administrator suffers from a "conflict of interest" when it plays a "dual role" of "both determin[ing] whether an employee is eligible for benefits and pays benefits out of its own pocket."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).

In this case, it is undisputed that the Plan appoints the Bank's Board of Directors as the Administrator. It is also undisputed that the Bank's Board is responsible for paying the unfunded Plan benefits out of the general assets of the Bank. Under this scenario, the Court finds this is the type of "dual role" the Supreme Court has defined as an ERISA conflict of interest.

Having found a conflict of interest is present, "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits . . . ." *Id.* at 108. The conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . ." *Id.* at 117. The conflict of interest "should prove less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." *Id.*

First, it was the Bank Board, meeting in its Bank capacity and not as Plan Administrator, who first terminated benefits payments. The Bank, during two meetings, discussed: (1) terminating benefits without specific reasons; (2) intending to shift the burden to Shepherd to prove he deserved benefits; and (3) never once resorted to the Plan to see if its actions were authorized. Instead, the Bank plainly noted there were millions of dollars of shareholders money out there in a retirement account for Shepherd. The Board recognized that it would have to pay those millions of dollars to Shepherd for close to twenty years, and was focused on its protection of shareholders. Under these facts, the conflict of interest was the driving force for the initial benefit denial.

Furthermore, the conflict permeated throughout the entire administrative remedy process. The same law firm that represented the Bank in its 2015 benefit denial and in

its state court lawsuit against Shepherd represented the Administrator, thrusting them into the simultaneous role of prosecuting claims of wrongdoing and advising the Administrator of its duties. This created an adversarial nature to the process, opposite of the foundational responsibilities of an ERISA Administrator.

The law firm's role in proving allegations of misconduct in the Bank's state case, while concurrently using those allegations to justify the denial of benefits, led to the hijacking of the plan remedy process. Similar to the law firm's discovery abuse in the state case, the plan remedy process saw the law firm further deny Shepherd the right to documents and shift the burden to Shepherd to find both the Administrative Record and the Administrator's reasoning.

The conflict of interest also explains specific failures that occurred during the review process. First, the Defendants assert the Record consists of documents produced by the Bank in a non-ERISA matter. These assertions are misplaced, as the Administrator has a duty to disclose relevant documents relating to the decision to terminate benefits, and cannot claim the Bank's broad discovery production in its state-court lawsuit.

Further, the Court finds the assertion that the Plan Administrator relied on over 41,000 documents either untrue or supports a finding that the Administrative Record was intentionally manipulated. If the Administrator did indeed rely on each document, then each document should have been included in the Administrative Record. The most plausible explanation for the lack of these documents in the Record is the Plan Administrator claimed it relied on all 41,000 document so Shepherd would be unable to discern which, if any, documents actually supported the denial. It then "cherry picked"

favorable documents to submit in the Record.

In addition, the Administrator improperly undertook the role of the Bank in its determination that the Bank would have terminated Shepherd "for cause." Even though the Bank never chose to undertake the procedure to determine "cause," the Administrator assumed the role and made the determination unilaterally. If the Bank failed to prove allegations in the state case, this conflict gave the Administrator another attempt to address the allegations under a lesser standard of proof and minimal discovery for Shepherd.[4]

Ultimately, the Bank Board's dual role allowed it to predetermine the outcome of the benefits determination. It hired the same law firm to both investigate alleged wrongdoing in the state case and deny Shepherd benefits as the Administrator. The Bank Board terminated benefits and the conflict of interest controlled all subsequent decisions made by the Administrator relating to the termination of benefits and the procedures for the denial process. This is clearly a case where the conflict of interest was more than merely present. It was the motivating influence in the Administrator's decision to uphold the Bank's initial decision to deny Shepherd's benefits.

### 2. Reasoned and Deliberate Process Consistent with ERISA's Requirements

The Administrator failed to conduct a reasoned and deliberate administrative review process. Throughout the process, the Administrator created a moving target of justifications for its decision, failed to observe ERISA safeguards, and allowed lawyers to turn the process into an adversarial ligation-like proceeding.

---

[4] The Court notes that the Bank did dismiss its state court allegations against Shepherd.

The Supreme Court has held that ERISA "sets forth a special standard of care upon a plan administrator, namely, that the administrator discharge [its] duties in respect to discretionary claims proceedings solely in the interest of the participants and beneficiaries of the plan . . . ." *Glenn*, 554 U.S. at 115 (internal citations and quotations omitted). The ERISA notice requirements direct an administrator to provide "specific reasons" for a denial of benefits. 29 C.F.R. § 2560.503-1(g)(1)(i). The Fourth Circuit has warned plan administrators to provide specific reasons rather than conclusory statements. *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 158 (4th Cir. 1993). The notice must also contain: (1) references to specific plan provision(s) the decision is based upon; (2) a description of additional material necessary for the claimant to file a claim and why such information is necessary; and (3) a description of the plan's review procedures and timelines. 29 C.F.R. § 2560.503-1(g)(1).

The ERISA procedural requirements mandate an Administrator respond to claims denials in 90 days and claims reviews in 60 days. 29 C.F.R. § 2560.503-1(f), (h). "These procedural guidelines are at the foundation of ERISA." *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154 (4th Cir. 1993).

Despite the well-established procedural safeguards recognized by courts in the ERISA context, in this case, there is little evidence of the procedural integrity on the part of the Administrator.. The Record is devoid of evidence proving the Plan Administrator ever met. There is also little to no evidence showing the Administrator analyzed documents and applied its analysis to the terms of the Plan. The Record and correspondence between the parties merely indicates that the Administrator asserted similar allegations of misconduct that the Bank was pursuing in state court, and requested

Shepherd submit documents that would rebut unproven and vague allegations. When he did submit documents, the Administrator either ignored the documents or viewed the Bank as a more credible source of information, even though it was aware the Bank had a litigious relationship with Shepherd and was mired in discovery issues that had resulted in one of the harshest sanctions orders this Court has ever encountered.

Specifically, the Court finds the Defendants failed to follow the most basic procedural safeguards. As to the notice requirements, the Bank's first denial letter wholly failed to comply with the ERISA notice requirements. It failed to: (1) reference the Plan, (2) give specific reasons for the denial; (3) explain what additional information was necessary for the claim and why; and (4) explain the plan remedy process and timelines. Put simply, it failed to even acknowledge that ERISA applied to the disputed claim.

As to ERISA deadlines, the Administrator failed to respond until a year after benefits had been denied and changed justifications for the Bank's decision to deny benefits. This Court previously held this was a violation of ERISA procedural regulations. *See* ECF 65 at 11 ("The Court holds Defendant's failure to timely respond constitutes a procedural violation of ERISA and of Article 6 of the Plan."). Since the Administrator was wholly responsible for the failure of the parties to exhaust administrative remedies, the Court allowed the Administrator another opportunity to complete a full and fair review by remanding for the 60-day review procedure. The Administrator took this opportunity to assert a ***third denial notice***, again asserting additional justifications for the denial. The Administrator's constantly changing basis for the denial has been a moving target throughout this litigation, and the Court finds that the Administrator has engaged in a calculated effort to avoid paying benefits.

34

In conclusion, the Administrator's process was neither reasoned nor deliberate. The Administrator violated ERISA's notice and procedural regulations, and this process resembled an adversarial ligation in which the Administrator asserted conclusory determinations in a deliberate effort to avoid paying benefits. It left Plaintiff to guess as to documentary basis of the justifications and gave him no useful guidance on what documents were needed to "rebut" the decision. Therefore, this decision weighs in favor of reversing the decision to deny benefits.

### 3. The Adequacy of Materials Considered and the Degree They Support the Decision

The Court finds the Administrator considered inadequate materials and failed to support its decision with the evidence. Therefore, these factors weigh in favor of reversing the denial. "A complete record is necessary to make a reasoned decision, which must rest on good evidence and sound reasoning; and . . . result from a fair and searching process." *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 21 (4th Cir. 2014) (internal quotation and citation omitted). "ERISA does not envision that the claims process will mirror an adversarial proceeding where the [claimant] bear[s] almost all of the responsibility for compiling the record, and the [Administrator] bears little or no responsibility to seek clarification when the evidence suggests a legitimate claim." *Id.* (internal citation and quotation omitted). "A searching process does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information that might support a successful claim, and "[a]n ERISA [Administrator] presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Id.* (internal citation and quotation omitted).

To accomplish a full and fair review, ERISA regulations mandate the Administrator

produce relevant documents at two discrete stages of the administrative remedy process. First, relevant documents generated or relied on upon during the initial claims decision must be disclosed prior to or at the outset of an administrative appeal. *See* 29 C.F.R. § 2560.503-1(h)(2). Second, the Administrator must disclose relevant documents generated during the administrative appeal, including the documents generated during the initial decision, after the final decision is rendered. *See* 29 C.F.R. § 2560.503-1(i)(5).

In this Plan, Section 8.5 required the Bank to "supply full and timely information to the Plan Administrator on all matters relating to the date and circumstances of the retirement, Disability, death, or Separation from Service of the Executive and such other pertinent information as the Plan Administrator may reasonably require." The duty to supply information is focused on the "first event to occur" but also encompasses other pertinent information. As previously, discussed, the Administrator had no authority under the Plan to weigh evidence and make determinations of a "for cause" termination.

Given the lawsuit between the Bank and Shepherd, the Administrator should have taken precautionary steps to ensure the Bank's compliance with its duty to provide records. It should have also demanded the Bank terminate Shepherd and waited to see if the misconduct allegations were proven in state court. The Administrator took the opposite approach, choosing to assert reliance on the Bank's production of documents in the state court case and adopt the allegations. This failure to insulate itself from the Bank resulted in the reliance on a state court case that was dismissed and a document production for which the Bank was monetarily sanctioned for its willful noncompliance with discovery rules.

By aligning its ERISA Administrative Record with the Bank's state court document

production, the Administrator failed to compile a trustworthy record. The Administrator made multiple assertions about the content of the Record. First, it told Shepherd the Record consisted of 8,602 records produced by the Bank as of April 2016. It later claimed it relied on over 41,000 documents. Eventually, the Administrator submitted a mere 1691 documents as the Administrative Record, of which Shepherd submitted almost close to 900.

More importantly, the Court is unable to discern what documents the Administrator actually considered to make the final denial because the Administrator failed to produce documents in a way that clarifies what was known at each of its denial decisions. It is clear from the Record that no documents supported the Bank's initial decision to terminate benefits. That decision was made with the strategy to develop—through litigation counsel—an investigation to justify the termination of benefits.

Consequently, the Court finds the Record submitted does not contain adequate materials. To satisfy the Administrator's responsibility, it was required to demand the Bank's compliance with Section 8.5, and not settle for a document production that led to sanctions. It was also prohibited from submitting a record devoid of nearly all the records on which it claims it relied.

As to the documents in the Record, they fail to support the Administrator's factual determinations. These factual determinations resulted from either ignoring contradictory documents Shepherd submitted or from the use of questionable citations prohibited from review by the Court.

For example, the Administrator ignored evidence that the allegations of misconduct were known to the Bank well before 2015. Shepherd submitted the Bank Board meeting

minutes from July 2014—six months before he retired. These minutes clearly show the Bank discussed allegations of misconduct with Shepherd at this time. Indeed, the Board specifically questioned Shepherd about loans to McCoy and Powell.

In further support, Shepherd submitted an FDIC Report detailing a review of the Bank in 2012. This document was never referenced by the Administrator. This Report shows the FDIC scrutinized each of the complained of loans to Powell and McCoy in 2012. Each Board Member then signed off on this Report acknowledging issues with these loans.

Taken together, the documents illustrate the Bank knew about the issues with these loans as early as 2012 and no later than 2014.[5] The Bank knew of these loan issues at the time that it could have instituted the Employment Agreement's termination procedure and fired Shepherd "for cause." These documents directly contradicted the Administrator's determination that the Bank only discovered issues with these loans after Shepherd retired and "would have" terminated him. Ignoring this evidence was essential to the Administrator's goal of justifying the predetermined result, because it allowed the Administrator to explain why the Bank failed to even start the process to terminate Shepherd.

Likewise, Shepherd submitted documents related to the FDIC regulations that were specifically ignored and contradicted the Administrators determinations. Shepherd submitted three legal opinions previously in the Bank's possession stating he Plan was not a golden parachute. He also argued the FDIC email chain the Administrator relied on

---

[5] The Court notes that this knowledge likely was a contributing factor to the Bank's eventual dismissal of its state court lawsuit, as the relevant statutes of limitations may have prevented recovery.

was incomplete, and he submitted the full chain to show the FDIC reviewed his Plan and was aware of the continued payments, contrary to assertions of the Administrator.

The Administrator failed to reference any of these documents and continued to assert it lacked FDIC approval to pay benefits. The documents directly contradicted this requirement, as legal opinions show it was not needed and the FDIC previously reviewed the Plan.

The Court could continue illustrating document after document that the Administrator failed to consider. In the interest of expediency, it is sufficient to note that Shepherd submitted hundreds of documents to support his claim that there was no merit to the allegations of misconduct and the Administrator only addressed a handful.

In sum, the Administrator failed to adequately consider documents, mainly evidenced by its assertion the Record is comprised of a tainted Bank document production in a state court case. It failed to consider documents submitted by Shepherd, and cited to the Record without specificity to support its determinations. Thus, this factor weighs in favor of reversing the denial decision.

### 4. The *Booth* Factors Overall

An assessment of all the relevant *Booth* factors illustrates the Administrator's decision to terminate benefits was unreasonable and reversible under any standard of review. Essentially, the Defendants ask this Court to find ambiguity in the clear terms of the Plan so as to allow it to use its "discretion" to retroactively terminate Shepherd and deny him benefits he earned by giving up his retirement and working longer for the Bank. The Defendants would have the Court uphold this decision based on deference to a plan remedy process the Administrator claims was reasonable.

However, the Plan terms, negotiated by parties with equal bargaining powers, are clear and evidence a unilateral contract in which Shepherd was owed benefits after he completed continued employment at the Bank. The determinations of misconduct were not the result of a reasonable process supported by evidence. On the contrary, the process more closely resembled an adversarial proceeding in which the Bank Board used its role as an Administrator to take money from Shepherd under a "reasonableness' standard in case the Bank failed to prove its civil state case beyond a preponderance of the evidence.

Lastly, the Court acknowledges in many instances, the appropriate remedy for violations of ERISA regulations is a remand for a "full and fair review." A remand, however, is not required in cases, like here, where the evidence shows the administrator abused its discretion. *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993). Put simply, a remand would not be beneficial, because Shepherd is plainly entitled to benefits under the clear and unambiguous language of the Plan. Plaintiff—a retired, elderly man— has lived long enough without the benefits he bargained for, and a remand would be futile in light of the Administrator's repeated efforts to thwart Plaintiff's entitlement to those benefits. Therefore, the Court finds the Administrator's decision to deny benefits unreasonable and an abuse of discretion and reverses the decision.

## DEFENDANTS' COUNTERCLAIMS

The Defendants filed multiple counterclaims generally seeking recoupment of previous benefits payments provided to Shepherd under the Plan. ECF 74. The Court previously held that the Defendants' multiple state-law causes of action were preempted

under ERISA.  ECF 84.

Subsequently, Shepherd filed a Motion to Dismiss the remaining ERISA based counterclaims, arguing each failed as a matter of law.  ECF No. 85.  More specifically, he claimed: (1) the Plan at issue is a "top hat" which has no fiduciary duties; (2) the ERISA based counterclaims can only be brought by a beneficiary, participant, or fiduciary; (3) the Defendants are not a beneficiary, participant, or fiduciary and cannot bring the causes of action.  *Id*.  This Court denied that Motion, finding only that the claims were "facially plausible."  ECF 125.  Shepherd, thereafter, timely filed an Reply to the Counterclaims. ECF 126.

Because this Court determines the Administrator's decision to terminate Shepherd's benefits was not reasonable, the Court need not address either the legal basis or merits of the Defendants counterclaims.  As such, the Court denies the relief requested and grants judgment in favor of Plaintiff on Defendants' counterclaims.

## ADMINISTRATIVE REMEDY

ERISA provides for an administrative penalty when an administrator "fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish . . . within 30 days after such request."  29 U.S.C. § 1132(c)(1)(B) The remedy for the failure or refusal is up to $100/day from the date of such refusal.  *Id*.

Shepherd argues he is due an administrative penalty for the Administrator's refusal to timely produce documents during the claims and review procedures.  The Defendants argue that the cause of action fails as a matter of law.

The Court agrees with the Defendants. The ERISA Regulations do not provide a penalty for withholding the category of documents for which Shepherd complains. The regulations merely provide that an administrator must disclose controlling plan documents, the latest update summary, plan description, bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. 29 U.S.C. § 1024(b). Most of these documents are wholly irrelevant to the "top hat" plan at issue, which is exempt from many of the ERISA substantive regulations. Therefore, the Court denies Shepherd's request for an administrative remedy.

## ATTORNEY'S FEES AND COSTS

ERISA allows grants discretionary power to courts to award reasonable attorneys' fees. 29 U.S.C. § 1132(g). In *Quesinberry v. Life Ins. Co. of North America,* the Fourth Circuit found that, despite the remedial purposes of ERISA to protect employee rights and to secure effective access to federal courts, there was no presumption in favor of awarding attorney's fees to a prevailing insured or beneficiary. 987 F.2d 1017, 1029 (4th Cir.1993). Instead, the Fourth Circuit set forth five factors to provide general guidelines for district courts to determine whether attorneys' fees under ERISA are warranted and the amount of such fees: (1) degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions. *Id.* The "five factor approach is not a rigid test, but rather provides general guidelines for the district

court," and some of the factors may not be appropriate in any given case. *Id.*

Shepherd argues he is entitled to attorney fees because each factor weighs in his favor. Generally, he claims attorneys' fees are warranted because the Bank terminated his benefits for no reason, controlled the outcome of a litigation-style administrative review, and had no intention of reinstating benefits unless ordered to do so by the Court. He further states this is the quintessential situation where attorney's fees are contemplated, since the Bank created needless litigation by stopping benefits with no reason in efforts to protect its own interest. The Defendants only summarily request denial of attorneys' fees and do not address the relevant factors.

Weighing the factors, the Court finds that attorney's fees are appropriate. The Bank, as Plan Sponsor and as Plan Administrator, originally terminated benefit payments for no specific reason and without any reference to the Plan. It repeatedly violated ERISA regulations during the Administrative Process and acted in bad faith throughout the underlying state court litigation and the claims process.[6] The Bank, having paid its attorneys to litigate this matter for over three years while it withheld Shepherd's earned benefits, is clearly able to afford an award of attorney's fees.

Further, an award of attorney's fees should stand as a lesson for future plan sponsors and administrators—especially those operating under a conflict of interest—that

---

[6] Arguably, Defendants' bad faith conduct continued throughout this federal litigation due to their deliberate representation that the Plan is not a "top hat" plan after having filed a declaration with the Department of Labor, which represented the Plan *is* a "top hat" plan. *See* ECF No. 93. Plaintiff obtained this document from the Department of Labor, as Defendants did not produce it during discovery. This type of "hide the ball" litigation is unbecoming and brings disfavor upon the profession. It is particularly egregious in this case in light of the fact that Defendants have already been sanctioned by the state court for discovery violations.

the protections of ERISA mandate that benefit denials result from full and fair review process, not a deliberate effort to avoid the plain terms of an agreed-upon contract in order to financially benefit shareholders.  Next, since Shepherd was the sole recipient of this Plan at the Bank, the Court finds the fourth factor inapplicable.  Finally, the Court finds the merits of the parties' positions weighs heavily in favor of awarding attorneys' fees. The clear and unambiguous language of the Plan clearly limited the ability to terminate payments.  Yet, the Defendants have continued to assert differing justifications and tortured readings of the Plan to deny Plaintiff the compensation he is due.

Under these circumstances, the Court finds an award of attorney's fees appropriate.  Plaintiff is hereby ordered to submit an application for attorneys' fees, including affidavit(s), time sheets, and other supporting records, to the Court within 14 days of the entry of this Order.

## CONCLUSION

For the reasons detailed above, Plaintiff's [99] Memorandum in Support of Judgment is **GRANTED** and Defendants' [98] Memorandum in Support of Judgment is **DENIED.**

IT IS SO ORDERED.

s/Donald C. Coggins, Jr.
United States District Judge

March 28, 2019
Spartanburg, South Carolina